Good morning, Your Honor. Christine Chorney appearing on behalf of the petitioner Sadie Marie Ford. May it please the Court, the issue in this case is whether the petitioner, Sadie Marie Ford, who is the personal representative of the deceased, Clydell Perry, is entitled to recover $100,000 from Respondent National Credit Union Administration for money that was taken out of the decedent's credit union account by a person named Joyce Jeter without proper authorization or legal authority. During her lifetime, the decedent had an account at Cal State Nine Credit Union. In March 2006, Ms. Jeter withdrew more than $177,000 from this account. Excuse me, ma'am. Can I ask you a quick question? Sure. Ms. Jeter, didn't she put the money in there? No, this was, as I understand, this was Clydell Perry's money. I understand, but who actually opened the account? It was Clydell Perry's money, and it had come from, there was a previous account, and she had had an account there for some time. I see. But how did Ms. Jeter get on the account? She got, she added herself to the account by using a power of attorney that Ms. Perry had given to her and subsequently withdrew. But well after this? She withdrew, yes, she withdrew the, she withdrew the power of attorney before Ms. Jeter took the money out. In other words, the sequence of events. I thought, okay, I thought that in November 2004, Jeter as power of attorney for Perry opened an account on Perry's behalf at Cal Nine, and that isn't true? The money was in another, Clydell Perry had an account under a different number at that credit union, and what Ms. Jeter did at that time was she closed the first account and moved the money to another account. That's what I thought. So she did open this account, and she did then list herself as, she enlisted Clydell Perry as the primary account owner, but she also listed herself and someone else, I believe. Right. She added herself to the account, and then she made some. The person was your client, right? Ms. Ford. Pardon me? Ms. Ford, Perry, and Ms. Jeter were all sort of co-signers on this account. Isn't that correct? Yes, as I understand. So at that point, Ms. Jeter can withdraw any money from that account. Well, she. It doesn't have anything to do with whether the power of attorney is revoked. The issue is that she did not take the money out under the power of attorney. She took it out under a Texas guardianship order, which was ineffective and incomplete. It doesn't really matter because her name was on the account. It didn't really matter what capacity she told them she wanted to take the money out in. Well, that. She was entitled to take the money out at any time. That was certainly what the liquidating agent and the National Credit Union Association Board argued, but it. Ms. Ford could have come and taken the money out, couldn't she? Pardon me? Ms. Ford could have come and taken the money out. Ms. Ford could have gone over to the credit union because she was on the joint account, right? I'm not sure at that point if she was. She was. Apparently, according to the record, she was. She could have taken the money out. Yes, but she didn't. I understand. There was another battle going on with somebody else, apparently. They were trying to keep from getting the money. If you're referring to Annie Cooper, that appears to be correct. But, again, Annie Cooper didn't take the money. No, that's because that's the reason they moved it to a different account. That could be. I'm just looking at the record. Yes. But the point is that the order was ineffective because Ms. Jeter had not filed a bond and letters of guardianship had not been issued to her. Right, but from the credit union's perspective, she's a co-signatory on this account, which means that she is entitled to remove any penny, every penny from that account at any time. That's what the Lee case tells us, right? She, as a holder of a power of attorney, she was a fiduciary, and she is not entitled to make a gift to herself. She can be sued for breach of fiduciary duty, but the credit union has to honor her signature on the check. It's just like she's holding the ATM card and has the password. She can go and withdraw the money at any time. The credit union didn't give her the money pursuant to her alleged joint ownership of the account. The credit union clearly issued the money to her as guardian of the estate of Clyde L. Perry. Did they cut her a check? They cut her a check. The check is in the excerpts of records. It states, as guardian for the benefit of Clyde L. Perry, and it was for all of the money in account. Does that, in the end, matter? If that's correct, that, you know, there's reference to her being a guardian, does that really matter? If she was a joint owner on the account, was never removed as a joint owner from the account, she could have gotten that money either way, right? Well, you're talking about an elderly and possibly incapacitated person who gives Ms. Jeter a power of attorney. Pursuant to that power of attorney, Ms. Jeter adds herself to the account. Then Ms. Perry cancels the power of attorney, but supposedly, according to the respondent, she remains forever on the account and can steal the money. What was the ---- But then maybe you have a claim against Ms. Jeter. I don't know. How is the bank, you know, supposed to not give money to someone who's clearly listed as a joint owner on the account? It appears in the bank records that there, and this is again in the excerpts of record, that there was already a dispute between two persons having the power of attorney, and the bank made a note in its records not to release the money. That had to do with the other account. Well, the bank was still aware that there was a dispute and was not releasing the money. No, but that's not this account. That's the other account. So the next question is, did anybody ever know, is there anything in the record that anybody ever notified the bank that there had been a withdrawal of the power of attorney or that Ms. Jeter was no longer entitled to withdraw the money? Yes. Is there something in the record that said that the bank got, or the credit union got, that before Ms. Jeter withdrew the money, that she was not entitled to withdraw the money? The bank received a copy of the new power of attorney. So by operation of law, a new power of attorney revokes the prior power of attorney. But that doesn't change the account. Is there anything, anybody notify the bank or ask the bank to change the account? Well, after all the money was withdrawn, the bank ran a report on this account that showed that only Clyde L. Perry was the owner of the account. So we don't know if we have all the documentation. We only have what was received through discovery from the credit union. So our position is, as stated in the briefs, that it is irrelevant that Ms. Jeter could have withdrawn the money as a joint owner because she did not do so. She was the niece, right? She was the niece. That's correct. The check, who decided to cut the check to Joyce Jeter as guardian for, I can't read what the word says, something of Clyde L. Perry? Apparently it was Diana Brunn who was the manager in the bank. And that was her decision to pay it that way? This is a very, very large check, so I assume that this isn't done just idly. Did Ms. Jeter have to fill out some paperwork in order to request a check that large? Not that we, not that it has ever been provided to us. She can just go up to the counter? No information on that has been provided to us. Is it Cal State's obligation to check and make sure that Ms. Jeter is guardian? It is because she presented the order from the Texas court, and that order, which is in the record specifically states that she is to file a bond in $100,000. If she showed up at the cash window and simply said, I'm Joyce Jeter, I'd like to withdraw all the money in the account, can you cut me a check? Well, then we'd have a different case and a different argument. The point is that she did not do that. Why does it matter here if she was entitled to, legally entitled, to withdraw all of the funds in the account? Because she withdrew the money under false premises, that she was the guardian of the. Well, it's too bad that the record doesn't reflect it, because I'm very curious as to whether the manager thought to put this on there, or whether Ms. Jeter may have had to fill out a form, says I need a cashier's check and I would like it made out as follows, in which case the bank is simply following her instructions. She can take out Joyce Jeter as niece of Clyde L. Perry. Well, I agree with you that it's unfortunate that we don't have this information, but the only information we have is what the credit union provided to us, and there's nothing in there except that they did have the Texas guardianship order, which indicates that that was provided to the credit union by Ms. Jeter, and apparently based on that, they issued a check payable to Joyce Jeter as guardian for the benefit of Clyde L. Perry. So the argument that she could have withdrawn the money as a joint owner appears to be nothing more than an ex post facto rationalization. It actually appears to be an independent justification for allowing her to do it. It could be referred to that as well, but it seems to me that what we should look at here and what I would ask the court to look at is what happened, what actually happened here, and not what might have happened. And what actually happened was improper under the law. It was improper because of the order was not complete. The credit union should have asked to see the letters of guardianship, and it did not do so. It simply handed over the money, and it was a significant sum of money. Is there anything in any of the credit union administration's regulations or in any banking practice or banking manuals or internal manuals to Cal State 9 that tell the bank manager how she is to proceed when she gets a request for something dealing with guardianship? Not that I could find and not that was provided through discovery, but, you know, one has to wonder if Ms. Jeter could have simply walked up to the counter and filled out a withdrawal slip and gotten the money as a joint owner, why she went to all the trouble and expense of hiring an attorney in Texas and going to court there and getting herself appointed as guardian, if she could have simply withdrawn the money. There may be some reason that the credit union would not give her the money as a joint owner. I don't think we can speculate because there could be any number of external, extrinsic other issues involving other property or other issues that might have been involved that we don't have before us. There could be any number of reasons. There's also the issue of insurance coverage, since it is not disputed that under California law, if a bank improperly pays money to an unauthorized person, it's paying its own money and cannot take that money out of the account holder's account. So in this case, the petitioner contends that even though the Clyde L. Perry account was technically was closed or ceased to exist on the, say on the books of the credit union, it still continued to exist for the purposes of insurance because the credit union was obligated to give credit to Ms. Perry for the money that was improperly taken. And based on that language, which is in U.S. Code section, 12 U.S. Code section 1752.5 and the corresponding regulation, the account continues to exist for the purposes of insurance. It isn't really an alternative argument. In order to get to the second point, you have to win the first one. That is, of course, that is correct. I agree. Counsel, you have half a minute. You may wish to reserve that for a rebuttal. Thank you. Ms. Winn. Good morning. May it please the court. I'm Constance Winn. I'm from the civil division appellate staff here on behalf of the national credit union administration. This whole issue in this case turns on whether or not Jeter had the legal authority to withdraw the funds, even though the credit union mistakenly issued her the funds as guardian. And she did not have guardianship appropriately because she never issued the bond. She was a signatory to the credit union account, pursuant to the statutory power of attorney that she acquired with the permission of Clyde L. Perry, who was the owner of the account. And if the court were to read the statutory durable power of attorney, it is indeed sweeping and quite broad. Indeed, it does give Jeter the power over all the banking and other financial institutional matters related to Clyde L. Perry. Well, I ask opposing counsel if there was anything in the record that the bank, I call it the bank, the credit union, had evidence that this durable power of attorney had been revoked before Ms. Jeter had withdrawn the funds. Is there anything in the record to establish that? No. Well, the funds were withdrawn in 2006. Right. And the durable power of attorney was switched to the Petitioner in 2005. Right. So we know that happened, but did anybody notify the bank? Well, I'm not sure that would have mattered as long as Jeter was still a signatory on the signature card, and there's no evidence that anyone did notify the bank. Well, that's what I was asking you. No, there is no evidence. And also, the signature card that was signed specifically states that if there is a change, there has to be an addendum that is submitted. And so, no, there's nothing, there's no evidence whatsoever that the signature card was ever changed. So as this Court acknowledged earlier, not only could Jeter have withdrawn the money at any time, Ford also could have withdrawn the money at any time. And it just seems as though Jeter pursued the matter a step further, getting the guardianship. She kind of beat Ms. Ford to the bank. Unfortunately. Or maybe I shouldn't say unfortunately, but it does seem that there may have been a race to the bank. I'm not sure, Your Honor. Counsel, you said that the credit union mistakenly issued the check to Ms. Jeter as guardian. What made it a mistake? She didn't have guardianship. And there was a discussion, but it was an investigated issue. And the court and the credit union did conduct their due diligence in regard to that issue. And they certainly would not have been required to do further investigation to determine whether or not the bond was established. They were submitted with the papers from the court, which directed that Joyce Jeter was indeed appointed guardian for Clydell Perry. Does it matter how the check is cut? No. I'm wondering, I'm wondering whether Ms. Jeter sort of filled out the line and says, who do you want to make this made out to? And she wrote it down in the bank. She simply typed it up and she wrote it down on the form. I'm not sure how that happened, Your Honor. There are areas of e-mail traffic. But the bottom line is that was she legal? Did she have the legal authority to get the money? And the answer to that is yes. And Petitioner has submitted no evidence that would compelling or convincing evidence that would require this Court to reverse the factual finding of the board in this matter. If she had not been a co-owner of the account, would the bank have had a different obligation? They would have, she would have to show some authority for the release of the funds. And the papers that she showed would have been sufficient? Well, that's not this case, Your Honor. Oh, I understand. I would hesitate to go. I'm trying to understand credit union law. Fortunately, we don't have to dwell into those, that issue right now. But I can, I can, I think, I think I would believe that the government's argument would be that the credit union did its due diligence. When they were submitted, the e-mail traffic shows that the bank manager did take it up to another level, to the real estate department, and say, I've been given this guardianship order. What do I do with it? And she was directed, it was reviewed, and she was directed to say, to the point to say that the guardianship was sufficient and she could, Jeter could legitimately withdraw the funds. It does seem a little odd that a, that the court in Texas would issue a guardianship order and sign it that had a future contingency on it that the court itself wasn't going to verify was satisfied. Because it seems like posting the bond would be a very, very simple thing to verify, and the court probably shouldn't have signed it until, until they knew that she had posted the bond. It, it does seem unusual, but that was the circumstances of this case. It just pushes, it just pushes it off on anybody who has shown the guardianship order from the court to figure out whether or not she satisfied this, this future contingency, and that doesn't seem to be an easy thing for a credit union or anybody else who has to deal with those papers to figure out. I agree. So the credit union certainly shouldn't be held to a higher standard than any other person would be held to under the circumstances of this case. And it also is, needs to be noted to the court again that Ms. Ford was a signatory to the, to the form also, and it could be assumed that perhaps she had some kind of relationship with the niece, Joyce Jeter. So she could have done her due diligence and looked into the matter also. This, this whole issue was not even raised until about over a year and a half later, after Clydell Perry passed, that it was investigated. So nobody even checked for a year and a half to determine whether the money was still there or not? Apparently, at least no, no claim was filed, or no one investigated, as far as we're aware. So we maintain that the Board's decision should be affirmed in this case, as there is no clear error of law, and the Court's factual findings were substantially supported by the record. Are there any other further questions? I don't think so. Okay. Thank you, Ms. Wendt. Ms. Charney, you've had a little bit of time. Just three short responses regarding Ms. Jeter's power over the banking transactions given in the power of attorney. That's correct. They are broad, but they are to be exercised only on behalf of Ms. Perry. It may have been difficult to verify whether a bond had been posted, but it would have been very easy to verify whether letters of guardianship had been issued since those are normally presented. Ma'am, if that is the case, your first point, isn't that exactly the way the check was cut? Exactly. It was cut to a guardian. And the third point that I want to make is that in the excerpts of record, pages 20 through 23, is the power of attorney issued to Sadie Marie Ford, which canceled the power of attorney issued to Joyce Jeter. And this came from the credit union's records. As you can see, the bait stamp on the bottom of the page. And likewise, the order appointing guardian also came from the credit union's files, as you can see from the bait stamps on the bottom. So the credit union had this information. Well, but nobody ever followed up to determine whether there was a card or a signatory or what the account was all about. I mean, Ms. Jeter could have opened up the account in her own personal name. Jeter for Jeter. She could have. That's apparently true. And so if they send a thing in that says, well, the guardianship for Ms. Perry is, you know, it's gone, what difference would it have made? Well, she would. This is the problem. It doesn't seem like anybody ever followed up here with the credit union. And what you're doing is you're attempting to shift the burden to the credit union to essentially become general counsel for everybody who deposits money. It's a difficult situation. California has amended the law, by the way, since this time. But it wouldn't even impact this case. Well, that's a problem you have when you have an elderly person who's possibly incapacitated. Well, there's a lot of tragedies. There's a lot of tragedies that occur in these situations. I've presided over many cases involving terrible situations like this. Well, I hope that you make the right decision in this case. Thank you very much. All right. Thank you, Ms. Charney. That's the hope of every district judge when they get appealed, believe me. It doesn't always work that way. We thank counsel for the argument. The Ford v. National Credit Union Administration is submitted.
judges: Ezra, Bybee, Murguia